Brendan Cummings (CA Bar No. 193952)
Kassia Siegel (CA Bar No. 209497)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone:  (760) 366-2232; Facsimile: (760) 366-2669
Email:  bcummings@biologicaldiversity.org and ksiegel@biologicaldiversity.org

Adam F. Keats (CA Bar No. 191157)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, CA 94103
Phone:  (415) 436-9682; Facsimile: (415) 436-9683
Email:  akeats@biologicaldiversity.org

Attorneys for Plaintiffs Center for Biological Diversity and Greenpeace, Inc.

Andrew E. Wetzler (CA Bar No. 202299)
Natural Resources Defense Council
544 White Oak Place
Worthington, OH 43085
Phone:  (614) 840-0891; Facsimile (415) 875-6161
Email:  awetzler@nrdc.org

Katherine S. Poole (CA Bar No. 195010)
Natural Resources Defense Council
111 Sutter St., 20th floor
San Francisco, CA 94104
Phone: (415) 875-6100; Facsimile: (415) 875-6161
Email:  kpoole@nrdc.org

Attorneys for Plaintiff Natural Resources Defense Council

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,; | CASE NO.: C-05-5191 EMC |
| Plaintiffs, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| GALE NORTON, et al., | **Date:** March 1, 2006<br>**Time:** 10:30 a.m. |
| Defendants. | **Judge:** Honorable Edward M. Chen<br>**Courtroom:** C, 15th Floor |

# Table of Contents

I.   INTRODUCTION ............................................................................................................. 1

II.  STANDARD OF REVIEW .............................................................................................. 3

IV.  LEGAL BACKGROUND ................................................................................................ 3

V.   FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 7

  A.   The Status of the Polar Bear ..................................................................................... 7

  B.   Plaintiffs' Petition and the Secretary's Failure to Respond .................................... 10

VI.  ARGUMENT .................................................................................................................. 11

  A.   Each of the Plaintiffs Has Standing to Bring this Action ........................................ 11

  B.   The Secretary is in Violation of the ESA for Failing to Make a 90-Day Finding on Plaintiffs' Petition to List the Polar Bear As a Threatened Species ................................................................. 12

VII. CONCLUSION ............................................................................................................... 15

1

**Table of Authorities**

2

**Cases**

3

Anderson v. Liberty Lobby, 477 U.S. 242 (1986) ..........................................................................3

4

Bennett v. Spear, 520 U.S. 154 (1997) .....................................................................................12

5

Biodiversity Legal Foundation v. Badgley, 309 F.3d 1166 (9th Cir. 2002) .................. 2, 11, 14, 15

6

Biodiversity Legal Foundation v. Badgley, 1999 U.S. Dist. LEXIS 17806 (D. Oregon 1999)............14

Celotex Corporation v. Catrett, 477 U.S. 317 (1986) ................................................................3

7

Center for Biological Diversity v. Norton, 163 F. Supp. 2d. 1297 (D. N.M. 2001) .......................15

8

Center for Biological Diversity v. Norton, 254 F.3d 833 (9th Cir. 2001)......................................12

9

Central Montana Electric Power Cooperative, et al. v. Administrator of the Bonneville Power Administration,

10

   840 F.2d 1472 (9th Cir. 1988)...............................................................................................13

11

Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141 (9th Cir. 2000)......................11

12

Environmental Defense Center v. Babbitt, 73 F. 3d 867 (9th Cir. 1995) .....................................12

13

Federation of Fly Fishers v. Daley, 131 F. Supp. 2d 1158 (N.D. Cal. 2000)...................................4

Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1999) .........................................3, 12, 15

14

Friends of the Earth v. Laidlaw, 528 U.S. 167 (2000)................................................................11

15

Fund for Animals v. Babbitt, 903 F. Supp. 96 (D.D.C. 1995) .....................................................13

16

Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1997).........................11

17

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).................................................................12

18

Portland Audubon Society v. Endangered Species Commission, 984 F.2d 1534 (9th Cir. 1993)............12

19

Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978)............................................................3

20

Tribal Village of Akutan v. Hodel, 869 F.2d 1185 (9th Cir. 1988), cert. denied, 493 U.S. 873 (1989)...................3

21

**Statutes**

22

The Administrative Procedures Act, 5 U.S.C. § 706 et seq. ........................................................3

23

The Endangered Species Act, 16 U.S.C. § 1531 et seq. ......................................................passim

24

**Other Authorities**

25

Endangered Species Petition Management Guidance ..................................................................5

26

H.R. Conf. Rep. No. 835, 97th Cong., 2nd Sess. .................................................................5, 13

27

H.R. Rep. No. 567, 97th Cong., 2nd Sess.................................................................................4

S. Rep. No. 418, 97th Cong. ....................................................................................................4

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................. 3

**Regulations**

50 C.F.R. § 424.14(a) .......................................................................................................... 5

50 C.F.R. §§ 17.11and 17.12 ............................................................................................. 6

1    **I.    INTRODUCTION**

2    This case concerns the fate of the polar bear (*Ursus maritmus*), undoubtedly one of the most

3    remarkable species on the planet, and, unfortunately, one that is increasingly imperiled.  The polar bear

4    is the apical predator of the Arctic and is the largest of all species of bear.  Polar bears live only in areas

5    of the Arctic where there is sea ice for a substantial portion of the year and are completely dependent

6    upon sea-ice habitat for their survival.  Indeed, the polar bear's dependence on sea ice is so complete

7    that, like whales and seals, they are classified as a marine mammal by scientists and the federal

8    government.  Polar bears utilize arctic sea ice for all of their essential behaviors, including mating,

9    traveling, and hunting and feeding upon ringed seals, their primary prey.  Some polar bears even give

10   birth to their cubs in snow dens on top of the drifting sea ice.

11   Yet the arctic sea ice habitat that the polar bear depends on is fast disappearing, threatening

12   polar bears with extinction.  The disappearance of arctic sea ice is caused by global warming, which

13   has resulted in an increase in average winter temperatures in the Arctic by 7° Fahrenheit over the past

14   50 years. Even using moderate projections of future greenhouse gas emissions levels, average winter

15   temperatures are projected to rise by 18° Fahrenheit over the Arctic oceans by the end of this century.

16   And leading climatologists agree that if the warming trend continues, summer arctic sea ice could

17   disappear entirely by the end of the century.  Polar bears simply cannot survive such a change.

18   Plaintiffs bring this case to advance protection for the polar bear under the federal Endangered

19   Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  While the threats to the polar bear may be global and

20   complex, this specific case is legally straightforward.  This case concerns a statutory deadline and

21   overdue required finding on a Petition, filed by Plaintiffs, to list the polar bear as a "threatened species"

22   under the ESA.  Specifically, Plaintiffs the Center for Biological Diversity, Natural Resources Defense

23   Council, and Greenpeace challenge the failure of Defendants, Gale Norton, Secretary of the Interior

24   and United States Fish and Wildlife Service (collectively, "the Secretary") to comply with the ESA's

25   non-discretionary deadlines for listing species.

26   The ESA requires the Secretary to issue an initial determination a petition to list a species,

27   called the "90-day finding", to the maximum extent practicable, within three months of receipt of the

28   petition.  15 U.S.C. § 1533(b)(3)(A). The ESA further requires the Secretary to issue a second

determination on a petition, called the "12-month finding", within a year of receipt.  15 U.S.C. § 1533(b)(3)(B).  Despite the ESA's qualification that a 90-day finding need only be made "to the maximum extent practicable," the Ninth Circuit has held that the Secretary must make the 90-day finding in sufficient time to allow the 12-month finding to be made within one year of receipt of a petition, because the mandatory 12-month finding deadline cannot be extended for any reason.  Biodiversity Legal Foundation v. Badgley, 309 F.3d 1166 (9th Cir. 2002).

The Secretary received the Plaintiffs' Petition to list the polar bear on February 17, 2005.  Despite her absolutely clear legal obligation to make the 90-day finding in sufficient time to allow the 12-month finding to be made by February 17, 2006, the Secretary has still failed to issue a 90-day finding.  Because the ESA requires the Secretary to conduct a "status review" of the species following the 90-day finding but prior to the 12-month finding, and because the Secretary's policies require a minimum of 30 days of public comment be solicited prior to a 12-month finding, the Secretary's overlong delay in issuing the 90-day finding has rendered compliance with the February 17, 2006 deadline for a 12-month finding impossible.  Moreover, by the date of the noticed hearing on Plaintiffs' Motion for Summary Judgment, over one year will have passed since the Secretary received the Petition, rendering any purported excuses of the Secretary legally irrelevant.

The Secretary's noncompliance with the timelines of the ESA has become the rule rather than the exception, and her inaction here causes grave harm to the polar bear and Plaintiffs' interests.  Because of the Secretary's illegal delay in responding to Plaintiffs' Petition, polar bears have not received, and will not receive, the protections they desperately need and deserve under the ESA absent an order from this Court directing the Secretary to make the findings required by statute.

There are no genuine factual disputes in this action.  The Secretary acknowledged receiving the Petition on February 17, 2005, and by the date of the noticed hearing on Plaintiffs' Motion for Summary Judgment, the Secretary will have been in receipt of the Petition for over 12 months without making the first required 90-day finding.  Plaintiffs are thus entitled to summary judgment as a matter of law because the Secretary's violation of the ESA could not be any more clear.  Accordingly, through this motion, Plaintiffs respectfully request that this Court find and declare that the Secretary is in violation of the ESA for failing to make the 90-day finding on Plaintiffs' Petition to list the polar bear.

1  Plaintiffs further request that this Court order the Secretary to make and publish the 90-day finding on

2  Plaintiffs' Petition to list the polar bear within 30 days of the Court's order.

3  **II.    STANDARD OF REVIEW**

4       A court shall render summary judgment if no genuine issue as to any material fact exists and

5  the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When the evidence

6  is "so one-sided that one party must prevail as a matter of law," summary judgment is appropriate.

7  Anderson v. Liberty Lobby, 477 U.S. 242, 251-52 (1986).  Where the moving party has demonstrated

8  that there is no material issue of fact for trial, the "adverse party may not rest upon the mere allegations

9  or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a

10  genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is not treated as "a disfavored

11  procedural shortcut" but as "an integral part of the Federal Rules as a whole, which are designed to

12  secure the just, speedy and inexpensive determination of every action."  Celotex Corporation v. Catrett,

13  477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

14       Because the ESA does not contain an internal standard of review, this Court's review is

15  governed by the Administrative Procedure Act ("APA").  Tribal Village of Akutan v. Hodel, 869 F.2d

16  1185, 1193 (9th Cir. 1988), cert. denied, 493 U.S. 873 (1989).  Under the APA, the reviewing court is

17  directed to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.  § 706.

18  Plaintiffs ask this Court to compel agency action unlawfully withheld.  Where, as here "Congress by

19  organic statute sets a specific deadline for agency action, neither the agency nor any court has

20  discretion. The agency must act by the deadline. If it withholds such timely action, a reviewing court

21  must compel the action unlawfully withheld." Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th

22  Cir. 1999).

23  **IV.    LEGAL BACKGROUND**

24       The ESA is a federal statute enacted to conserve endangered and threatened species and the

25  ecosystems upon which they depend.  16 U.S.C. § 1531(b).  The ESA "is the most comprehensive

26  legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley

27  Authority v. Hill, 437 U.S. 153, 180 (1978).  The Supreme Court's review of the ESA's "language,

28  history, and structure" convinced the Court "beyond a doubt" that "Congress intended endangered

species to be afforded the highest of priorities." Id. at 174.  As the Court found, "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." Id. at 184.

The ESA protects species listed as either "endangered" or "threatened" by the Secretary.  A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  A species is "threatened" if it is "likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20)

Once a species is listed, an array of statutory protections applies.  For example, Section 7 requires all federal agencies to "insure" that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of its "critical habitat."  16 U.S.C. § 1536(a)(2).  Section 9 and its regulations further prohibit, among other things, "any person" from intentionally "taking" listed species or "incidentally" taking listed species without a permit from the United States Fish and Wildlife Service ("Service").  16 U.S.C. §§ 1538-1539. Other provisions require the FWS to designate "critical habitat" for listed species, 16 U.S.C. § 1533(a)(3), require the FWS to "develop and implement" recovery plans for listed species, 16 U.S.C. § 1533(f), authorize the FWS to acquire land for the protection of listed species, 16 U.S.C. § 1534, and make federal funds available to states to assist in their efforts to preserve and protect threatened and endangered species, 16 U.S.C. § 1535(d).

However, none of these protections come into force until a species is officially listed as threatened or endangered under the ESA.  See, e.g., Federation of Fly Fishers v. Daley, 131 F. Supp. 2d 1158, 1163 (N.D. Cal. 2000) ("[L]isting is critically important because it sets in motion the [ESA]'s other provisions, including the protective regulation, consultation requirements, and recovery efforts.").  As a result, Congress aptly described Section 4 of the ESA, which sets out the process for listing a species, as "[t]he cornerstone of effective implementation of the Endangered Species Act . . . ." S. Rep. No. 418, 97th Cong., 2d Sess. at 10; see also H.R. Rep. No. 567, 97th Cong., 2d Sess. at 10 ("The listing process under Section 4 is the keystone of the Endangered Species Act").

In order to ensure the timely protection of species, Congress set forth the listing process described below.  The process includes mandatory, non-discretionary deadlines for the three required

findings that the Secretary must meet, so that species in need of protection do not languish in administrative purgatory.

Any interested person can begin the listing process by filing a petition to list a species with the Secretary.  16 U.S.C. § 1533 (b)(3)(A); 50 C.F.R. § 424.14(a).  Upon receipt of a petition to list a species, the Secretary has 90 days "to the maximum extent practicable," to make a finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C § 1533 (b)(3)(A); 50 C.F.R. § 424.14 (b)(1).  Although Congress intended the Secretary to issue 90-day findings within ninety days of receiving a petition to list a species, the language "to the maximum extent practicable" does provide the Service with some flexibility as to the timing of the finding.  The legislative history, however, clarifies that that this flexibility is not unlimited and can only be invoked in very specific circumstances:

> The phrase "to the maximum extent practicable" addresses the concern that a large influx of petitions coupled with an absolute requirement to act within 90 days would force the devotion of staff resources to petitions and deprive the Secretary of the use of those resources to list a species that might be in greater need of protection.  This phrase is not intended to allow the Secretary to delay commencing the rule-making process for any reason other than the existence of pending or imminent proposals to list species subject to a greater degree of threat . . . .

H.R. Conf. Rep. No. 835, 97th Cong., 2nd Sess. at 21.

If in the 90-day finding the Secretary finds that the petition presents substantial information indicating that the listing may be warranted, the Secretary must publish a notice to that effect in the *Federal Register* and initiate a full review of the status of the species.  16 U.S.C. §§ 1533(b)(1)(A) & 1533(b)(3)(A); 50 C.F.R. 424.14.  In carrying out the status review the Secretary solicits information from state and federal agencies, the general public, and, when appropriate, foreign nations.  See 16 U.S.C. §§ 1533(b)(1)(A) & (B); see also (Declaration of Kassia Siegel In Support of Plaintiffs' Motion for Summary Judgment ("Siegel Declaration"), Exhibit A at p. 11 (Petition Management Guidance).  According to the Secretary's Petition Management Guidance, promulgated in 1996, (61 Fed. Reg. 36075, July 9, 1996):

> Status reviews are required by Section 4(b)(1) of the ESA.  A status review is the act of reviewing all the available information on a species to determine if it should be provided protection under the ESA.  A status review should also use the knowledge of experts; the greater the extent to which Service biologists can build an external consensus using the

expertise of various parties (e.g., Federal, State, Tribal, University, Heritage programs), the better.  The Services must conduct the review after soliciting comments from the public by publishing a notice in the Federal Register and notifying State, Tribal, and Federal officials and other interested parties of the need for information.  A status review must be initiated for a species whenever a listing petition for the species is found to be "substantial."

Siegel Declaration, Exhibit A at p. 11; see also id. at p. 20 ("A 90-day finding notice should also include a due date for receiving comments (30 to 60 days is recommended).  This informs the public of the date by which the responsible Service needs to receive comments in order to use them in making a 12-month finding.")

Once the status review is completed—but no later than one year from the date she received the petition—the Secretary must make one of three findings: (1) that the petitioned action is not warranted; (2) that the petitioned action is warranted; or (3) that the petitioned action is warranted but presently precluded by other pending proposals for listing species, provided certain circumstances are present. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14 (b)(3).  This determination is known as a "12-month finding."  There is no mechanism by which the Secretary can extend the deadline for making a 12-month finding.  See Biodiversity Legal Foundation , 309 F.3d 1166, 1176  (holding that both 90-day finding and 12-month finding must be made within one year of receipt of listing petition.)

If, in the course of her 12-month finding, the Secretary determines that listing the species is warranted, then she must publish in the *Federal Register* a proposed rule, for public comment, to list the species as either endangered or threatened.  16 U.S.C. § 1533(b)(5).  Within one year of the publication of the proposed rule, the ESA requires the Secretary to render a final decision on the listing petition.  16 U.S.C. § 1533(b)(6)(A).  At such time, the Secretary must either list the species, withdraw the proposal, or if there is substantial disagreement about scientific data, delay a final determination by no more than six months to solicit more scientific information.  16 U.S.C. §§ 1533(b)(6)(A)(i)(III) & 1533(b)(6)(B)(i).  Once the proposed listing determination is finalized, the species is added to the appropriate list of threatened and endangered species, 50 C.F.R. §§ 17.11 (wildlife) & 17.12 (plants), and the protections of the ESA come into effect for that species.

If all the deadlines for petition processing and subsequent listing actions are met, the species should in most cases be officially listed under the ESA no later than two years from the date of the

petition.  Unfortunately, as is the case with the polar bear, the Secretary regularly ignores her statutory obligations and only moves to protect species under court order.

Section 11(g)(1)(C) of the ESA, 16 U.S.C. § 1540(g)(1)(C), provides that "any person may commence a civil suit on his own behalf…against the Secretary where there is an alleged failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary."

## V.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Status of the Polar Bear

Plaintiffs' Petition details the very real threat of extinction now facing the polar bear.  <u>See</u> Siegel Declaration, Exhibit B (Petition).  While the contents of the Petition are not material to the Secretary's straightforward procedural legal violation of the ESA's non-discretionary deadlines, the basic facts about polar bears and the threats to their continued survival documented in the Petition are included here for the Court's convenience and to underscore the dire situation now confronted by the world's polar bears.

There are twenty polar bear populations distributed throughout the Arctic.  These populations can be found within the jurisdiction of 5 countries:  the United States (in Alaska), Canada, Denmark (in Greenland), Norway, and Russia.  <u>Id.</u> at 2-3.  Worldwide polar bear abundance was most recently estimated in 2002 at 21,500-25,000 bears.  <u>Id.</u> at 3.

Polar bears are marine mammals and are completely dependent upon Arctic sea-ice for survival. Polar bears need sea ice as a platform from which to hunt their primary prey species the ringed seal (<u>Phoca hispida</u>), to make seasonal migrations between the sea ice where they feed and their terrestrial denning areas, and to find mates.  <u>Id.</u> at 41, 12-15, 16-19.  Some polar bears even give birth to their cubs in snow dens on top of the drifting sea ice.  <u>Id.</u> at 9.  Because polar bears hunt only when on the ice, when forced onto land either by the seasonal retreat of the sea ice in some areas or to give birth to their cubs, polar bears undergo a time of near complete fasting.  <u>Id.</u> at 39, 12-15.

The earth's climate is warming due to society's production of greenhouse gases, primarily from the combustion of fossil fuels for energy.  The primary greenhouse gases are carbon dioxide, methane, and nitrous oxide.  Increasing concentrations of greenhouse gases cause the earth's atmosphere to retain

a greater proportion of the sun's energy, warming the earth's climate much like the interior of a greenhouse. Climate science has advanced rapidly in recent years, and it has now been firmly established that society's production of greenhouse gases is responsible for the unprecedented rate of warming over the past century. Id. at iii, 22-25.

For a number of reasons, the Arctic has experienced greater and more rapid warming than temperate regions. Average winter temperatures in some areas of the Arctic have already risen by 7° Fahrenheit over the past 50 years. Id. at iii, 26-27. Even using moderate projections of future greenhouse gas emissions levels, average winter temperatures are projected to rise by 18° Fahrenheit over the Arctic oceans by the end of this century. Id. at iv, 33. As a result of the warming already experienced, Arctic sea ice is melting very rapidly. Id. at iv, 28-30. The total extent of summer sea ice as measured in September has been diminishing, and the sea ice edge now occurs hundreds of kilometers further from land than in the past. Id. at iv, 29. Summer sea ice may disappear entirely well before the end of this century. Id. at iv, 34.

Polar bears cannot survive the loss of their habitat. Id. at 41. Canada's Western Hudson Bay population, at the southern edge of the species' range, is already suffering from pronounced reductions in sea ice. Id. at iv-vi, 37-40. Break-up of the annual ice in Western Hudson Bay is now occurring on average 2.5 weeks earlier than it did 30 years ago. Id. Earlier ice break-up is resulting in polar bears having less time on the ice to hunt seals. Id. Polar bears must maximize the time they spend on the ice feeding before they come ashore, as they must live off built-up fat reserves for up to 8 months before ice conditions allow a return to hunting on the ice. Id. Scientists have observed that, as a result of the reduced hunting season, the polar bears in the Western Hudson Bay population are thinner, female bears have a lower reproductive rate, and survival among juvenile bears is reduced. Id. The population of polar bears in Western Hudson Bay has also declined approximately 14%, from 1,100 bears in 1995 to 950 bears in 2004. Siegel Declaration, Exhibit C at 2.

As trends in the Western Hudson demonstrate, polar bear populations may be in danger even without the complete disappearance of sea ice. Siegel Declaration, Exhibit B at v, 42. The timing of ice formation and break-up determines how long and how efficiently polar bears can hunt seals. Id. A reduction in the hunting season caused by delayed ice formation and earlier break-up means reduced fat

1    stores, reduced body condition, and therefore reduced survival and reproduction.  Id.

2           Reductions in sea ice will, in some areas, also result in increased distances between the ice edge

3    and land.  Id. at v, 47-49.  This will make it more difficult for female bears that den on land to reach

4    their preferred denning areas.  Id.  Bears will face the energetic trade-off of either leaving the sea ice

5    earlier when it is closer to land or traveling further to reach denning areas.  Id.  In either case, the result

6    is reduced fat stores and likely reduced survival and reproduction.  Id. Researchers with the United

7    States Minerals Management Service have also documented polar bears that drowned off the north

8    coast of Alaska in September 2004 when the ice edge was a record 160 miles from shore, and predict

9    that deaths by drowning will increase as sea ice continues to decline.  Siegel Declaration, Exhibit D.

10   Reduced sea-ice extent will also likely result in reductions in the availability of ice-dependent prey

11   such as ringed seals, as prey numbers decrease or are concentrated on ice too far from land for polar

12   bears to reach.  Siegel Declaration, Exhibit B at vi, 42-47.

13          Global warming will also likely increase the rates of human/bear interactions, as greater

14   portions of the Arctic become more accessible to people and as polar bears are forced to spend more

15   time on land waiting for ice formation.  Id. at vi, 52-55.  Increased human/bear interactions will almost

16   certainly lead to increased polar bear mortality.  Id.

17          The International Union for the Conservation of Nature's Species Survival Commission

18   ("IUCN/SSC") Polar Bear Specialist Group ("PBSG") is the world's preeminent scientific body for the

19   study, conservation, and management of polar bears and is responsible for assigning the polar bear's

20   status on the official "Red List" of the world's species at risk.  Id. at 2.  In June, 2005, the PBSG

21   classified the polar bear as "Vulnerable" due to the impacts of global warming.  Siegel Declaration,

22   Exhibit C at 4.  A "Vulnerable" species is defined by the IUCN as a species that faces a "high risk of

23   extinction in the wild."[1]

24          In addition to the loss of their habitat from global warming, polar bears are also threatened by

25   other factors, including high levels of organochloride pollution (such as PCBs), mercury, and other

26   toxins in the Arctic that bioconcentrate and bioaccumulate in polar bear tissue.  Siegel Declaration,

27

28

1   Exhibit B at 63, 125-133.  Polar bears are threatened by the proliferation of oil and gas development in

2   their habitat, which can disrupt denning, feeding, and other behaviors, and which also poses a risk of

3   harmful oil spills.  Id. at 61-2, 87-108.  Despite past successes in controlling formerly widespread

4   overhunting, polar bears are hunted at unsustainable harvest levels in some areas of Canada, Russia,

5   and Greenland.  Id. at 62, 109-124.   Polar bears will be exposed to increasing human activity, such as

6   shipping, that occurs as a result of decreasing Arctic sea ice.  Id. at 52-55.  Many of these threats will

7   interact with global warming in cumulative and synergistic ways, further heightening the threat to polar

8   bears.

9          B.       Plaintiffs' Petition and the Secretary's Failure to Respond

10          On February 16, 2005 Plaintiffs submitted to the Secretary a detailed 154 page petition

11  documenting the status of and threats to the polar bear and formally requesting that the Secretary list

12  the species as threatened or endangered under the ESA.  Siegel Declaration, Exhibit B (Petition).  Over

13  90 days passed before the Secretary even acknowledged receiving the Petition.  Cf Siegel Declaration,

14  Exhibit A at 8 (Petition Management Guidance)("A letter of acknowledgment must be mailed to the

15  petitioner by the lead Region within 30 days of a petition.").   In a letter dated July 1, 2005, the

16  Secretary acknowledged receiving the petition on February 17, 2005. Siegel Declaration, Exhibit E

17  (FWS Letter).  However, rather than indicating when the already overdue 90-day finding would be

18  made, the letter simply stated that the Secretary would "not be able to address your petition at this

19  time" due to alleged financial constraints.  Id.  The letter stated that the Secretary's ability to respond to

20  the Petition would be re-evaluated as "funds become available, and at the beginning of each fiscal

21  year," and that petitioners would be notified when funds are available to review any such petition.  Id.

22  Plaintiffs have received no further communication from Defendants.

23          On October 12, 2005, pursuant to the requirements of Section 11(g)(2)(C) of the ESA, 16

24  U.S.C. § 1540(g)(2)(C), Plaintiffs sent the Secretary a 60-Day Notice Letter of Intent to Sue for her

25  failure to issue the 90-day finding on the polar bear Petition in a timely manner.  Siegel Declaration,

26

27  [1] IUCN.  (2001.)  IUCN Red List Categories and Criteria: Version 3.1.  IUCN Species Survival
28  Commission.  IUCN, Gland, Switzerland and Campbridge, UK.  ii+30 pp at 14.  Available at
    http://www.iucn.org/webfiles/doc/SSC/RedList/redlistcatsenglish.pdf.

1  Exhibit F (Notice Letter).  Plaintiffs have to date received no response from the Secretary regarding the

2  60-Day Notice Letter.

3  **VI.   ARGUMENT**

4  As documented herein, there is no genuine dispute as to any of the material facts with regard to

5  Plaintiffs' claims.  More than 90 days have passed since the Secretary received Plaintiffs' petition to

6  list the polar bear under the ESA.  Given that by the time of the noticed hearing on Plaintiffs' motion

7  for summary judgment, over one year will have passed since the Secretary received Plaintiffs' Petition,

8  the Secretary's failure to issue a 90-day finding makes compliance with the 12-month finding deadline

9  impossible.  Any "reasonable" delay beyond the presumptive 90-day deadline of the ESA has long

10  since passed.  Plaintiffs now seek to have this Court compel the Secretary to make the required 90-day

11  finding by a date certain.

12  A.    Each of the Plaintiffs Has Standing to Bring this Action

13  Each of the Plaintiffs has standing to bring this action because: 1) their members have standing

14  to sue in their own right; 2) the interests at stake are germane to the organizations' purpose; and 3)

15  neither the claim asserted nor the relief requested requires their members to participate directly in the

16  lawsuit.  See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1997);

17  Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000).  Regarding

18  element (1), members have standing to sue in their own right if "they have suffered an injury in fact

19  that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical, . . .

20  the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to

21  merely speculative, that the injury will be redressed by a favorable decision." Ecological Rights

22  Foundation, 230 F.3d at 1147 quoting Friends of the Earth v. Laidlaw, 528 U.S. 167, 180-181 (2000).

23  Plaintiffs have established the facts necessary to establish each of these elements.  See

24  Declarations of Melanie Duchin, Lonnie James Dupre, and Jack W. Lentfer in Support of Plaintiffs'

25  Motion for Summary Judgment.   This case is factually nearly identical to Biodiversity Legal

26  Foundation, in which the Ninth Circuit held that environmental groups that petitioned to list several

27  species under the ESA had standing to challenge the Secretary's failure to make 90-day and 12-month

28  findings on those petitions.  Biodiversity Legal Foundation, 309 F.3d 1166, 1171-72.  In the Ninth

Circuit, "environmental groups have Article III standing if they allege procedural violations in an agency process in which they participated." <u>Biodiversity Legal Foundation</u>, 309 F.3d at 1172 <u>quoting Portland Audubon Society v. Endangered Species Commission</u>, 984 F.2d 1534, 1537 (9th Cir. 1993). Moreover, it is well settled that an individual's desire to observe, appreciate, and study a plant or animal species is "undeniably a cognizable interest for purposes of standing." <u>Biodiversity Legal Foundation</u>, 309 F.3d at 1172 <u>quoting</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562-63 (1992). Just as in <u>Biodiversity Legal Foundation</u>, Plaintiffs here have established standing to challenge the Secretary's failure to issue a 90-day finding on their Petition to list the polar bear under the ESA.

    B.    <u>The Secretary is in Violation of the ESA for Failing to Make a 90-Day Finding on Plaintiffs' Petition to List the Polar Bear As a Threatened Species</u>

    Section 4(b)(3)(A) of the ESA unambiguously states that, when presented with a petition to list a species under the ESA, the Secretary "<u>shall</u> make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."   16 U.S.C. § 1533(b)(3)(A) (emphasis added).   Congress' use of the word "shall" in Section 4 of the ESA imposes a non-discretionary duty on the Secretary.   The Supreme Court has stated with regard to the use of the word "shall" in the ESA's listing provisions, "the terms of § 1533(b)(2) are plainly those of obligation rather than discretion . . . ." <u>Bennett v. Spear</u>, 520 U.S. 154, 172 (1997). The Ninth Circuit has likewise held that the use of the term "shall" creates "a mandatory, nondiscretionary duty which may be enforced by citizen suit." <u>Environmental Defense Center v. Babbitt</u>, 73 F. 3d 867, 871 (9th Cir. 1995). <u>See also</u> <u>Forest Guardians v. Babbitt</u>, 174 F.3d 1178, 1190 (10th Cir. 1999) (holding that Courts must compel compliance with mandatory non-discretionary deadlines in the ESA.). The "statute is not at all ambiguous, but instead is exquisitely clear, concerning what the Secretary must do when she receives a petition requesting action on a species." <u>Center for Biological Diversity v. Norton</u>, 254 F.3d 833, 837 (9th Cir. 2001).

    The plain language of the ESA thus leaves no doubt that the Secretary must make a finding in response to Plaintiffs' Petition.   The only issue remaining is how long the Service can delay in making a finding on a petition before the agency is in violation of the law.

Section 4(b)(3)(A) directs the Secretary to make an initial finding "[t]o the maximum extent practicable, within 90 days after receiving a petition." 16 U.S.C. §1533(b)(3)(A). The Secretary has, in the past, taken the position that the phrase "to the maximum extent practicable" gives the agency unfettered discretion allowing it to delay a "90-day" finding indefinitely. Such a position is untenable. Congress' inclusion of this specific time period should not be construed as meaningless. See Central Montana Electric Power Cooperative, et al. v. Administrator of the Bonneville Power Administration, 840 F.2d 1472, 1478 (9th Cir. 1988) ("We avoid any statutory interpretation that . . . does not give effect to all of the words used by Congress.").

The 90-day time period establishes a presumptive deadline for this first step in the Section 4 listing process. As one court put it, the phrase "to the maximum extent practicable" limits an agency's discretion and "imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." Fund for Animals v. Babbitt, 903 F. Supp. 96, 107 (D.D.C. 1995). The legislative history of the section provides further evidence of the very limited discretion held by the Service:

> The phrase 'to the maximum extent practicable' addresses the concern that a large influx of petitions coupled with an absolute requirement to act within 90 days would force the devotion of staff resources to petitions and deprive the Secretary of the use of those resources to list a species that might be in greater need of protection. This phrase is not intended to allow the Secretary to delay commencing the rule-making process for any reason other than the existence of pending or imminent proposals to list species subject to a greater degree of threat . . . .

H.R. Conf. Rep. No. 835, 97th Cong., 2nd Sess. at 21.

The Secretary received the Petition to list the polar bear on February 17, 2005, and the Secretary's initial 90-day finding was presumptively due on May 18, 2005. The Secretary's failure to make the 90-day finding in a timely fashion has now made compliance with the 12-month finding impossible as well.

Even if the Secretary were to submit evidence that making a finding on the Petition within 90 days was not "practicable," this would not absolve her of her duty to make a finding. The Secretary may not postpone the initial finding indefinitely. Rather, the Secretary's limited discretion to delay the initial finding is constrained by her non-discretionary duty to determine, within 12 months of receiving a petition that is found to present substantial information that listing may be warranted, whether listing

is indeed warranted.  16 U.S.C. § 1533(b)(3)(B).  As described above, because the Secretary must take several steps between issuing the 90-day finding and making a 12-month finding (e.g. conducting a status review of the species and soliciting comments from States, Tribes, foreign nations, and the public), a 90-day finding must be made well in advance of the deadline for a 12-month finding.

The Ninth Circuit has resolved the precise issue of whether the Secretary's delay in making an initial finding is constrained by its nondiscretionary deadline for making the 12-month finding.  In Biodiversity Legal Foundation, the Ninth Circuit held that a 90-day finding on a citizen petition to list a species under the ESA must in all cases be made within 12 months of receipt of the petition, otherwise compliance with the deadline for a subsequent 12-month finding would be rendered impossible. Biodiversity Legal Foundation, 309 F.3d at 1178.  Moreover, the Ninth Circuit held that district courts are compelled to grant injunctive relief in an ESA listing case and are without discretion to consider the government's excuses for failing to act.  Id.

In Biodiversity Legal Foundation, the Ninth Circuit reviewed a district court's decision regarding 90-day and 12-month findings for several petitioned species.  The district court had ruled that the phase "to the maximum extent practicable" in Section 4(b)(3)(A) gave the Secretary virtually unlimited discretion to delay the initial 90-day finding on a petition to list a species, even beyond the 12-month point.  Biodiversity Legal Foundation v. Badgley, 1999 U.S. Dist. LEXIS 17806 (D. Oregon 1999), *13-15.  Conversely however, the district court held that once a positive 90-day finding was issued, the Secretary did not have discretion to delay a 12-month finding beyond twelve months from the receipt of the petition, that for such violation an injunction was mandatory, and that the Court would not consider the Service's reasons for the delay.  Id. at *19-24.

The Ninth Circuit rejected the portions of the district court's ruling dealing with the timing of a 90-day finding: "We rule that Congress intended to limit the flexible deadline governing the initial listing determination by enacting the firm deadline for making the final determination.   Both determinations must be made within one year."  Biodiversity Legal Foundation, 309 F.3d at 1176.  At the same time, the Ninth Circuit upheld the portion of the district court's ruling holding that an injunction was mandatory for violations of ESA listing deadlines and that the court lacked discretion to allow the Secretary any additional delay.  Id. at 1176-78.

1

2

3

4

> The Service's failure to complete the listing determinations within the mandated time frame compelled the court to grant injunctive relief. The court had no discretion to consider the Service's stated priorities. . .
>
> . . . We AFFIRM the district court's denial of the Service's request for additional time within which to make the warranted/not warranted findings in dispute. The exercise of discretion is foreclosed when statutorily imposed deadlines are not met.

5    Id. at 1178.

6          In sum, under controlling Ninth Circuit precedent, the ESA requires that the Secretary make it

7    90-day finding in sufficient time to comply with the deadline for making the subsequent 12-month

8    finding. With regard to Plaintiffs' Petition to list the polar bear, the Secretary has clearly failed to meet

9    this legal obligation. Summary Judgment in Plaintiffs' favor must be granted.

10          The only remaining issue for this Court to consider is how much time it should give the

11   Secretary to come into compliance with the clear legal duties she has ignored. In similar circumstances

12   to those in the instant case, courts have imposed short time frames in ordering the Secretary to comply

13   with mandatory ESA listing deadlines. See, e.g., Center for Biological Diversity v. Norton, 163 F.

14   Supp. 2d. 1297, 1301 (D. N.M. 2001) (requiring a 12-month finding be made by the agency within 30

15   days of the court's order); Forest Guardians, 174 F.3d at 1193 (noting that in similar deadline cases

16   district courts have ordered the Secretary to comply with its statutory obligations within between 5 and

17   120 days). Ordering the Secretary to make a 90-day finding on Plaintiffs' Petition by a date certain is

18   consistent with the Ninth Circuit's ruling in Biodiversity Legal Foundation that affirmed the district

19   court's refusal to grant the Service further time to issue mandatory Section 4 findings because the court

20   "had no discretion to consider the Service's stated priorities." Biodiversity Legal Foundation, 309 F.3d

21   at 1178. By the time of this Court's hearing on this Plaintiffs' Motion for Summary Judgment, the

22   Secretary will be over nine months overdue in making the required 90-day finding. Accordingly,

23   Plaintiffs respectfully request that this Court issue an order directing the Secretary to make a 90-day

24   finding on Plaintiffs' Petition to list the polar bear under the ESA within thirty days from the Court's

25   order.

26   **VII.   CONCLUSION**

27          For the reasons stated above, Plaintiffs respectfully request that the Court grant their motion for

28   summary judgment and order Defendants to make, and to publish in the *Federal Register*, a finding on

1  Plaintiffs' Petition to list the polar bear under the ESA within 30 days of entry of judgment.

2

3  DATE: January 18, 2006                    Respectfully Submitted,

4                                            CENTER FOR BIOLOGICAL DIVERSITY and
                                             GREENPEACE, INC.
5

6                                            By: /s/ Kassia R. Siegel

7                                            Brendan Cummings (CA Bar No. 193952)
                                             Kassia Siegel (CA Bar No. 209497)
8                                            Adam F. Keats (CA Bar No. 191157)
                                             Center for Biological Diversity
9

10                                           NATURAL RESOURCES DEFENSE COUNCIL

11

12                                           By: /s/ Andrew E. Wetzler
                                             Andrew E. Wetzler (CA Bar No. 202299)
13                                           Katherine S. Poole (CA Bar No. 195010)
                                             Natural Resources Defense Council
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28